## MOHR v. DETAMORE et al.

No. 28725.  May 14, 1940.

*102 P. 2d 850.*

Chas. L. Yancey, G. C. Spillers, and Kavanaugh Bush, all of Tulsa, for plaintiff in error.

Ward, Justus & Ward, of Tulsa, for defendants in error.

RILEY, J.  This is an appeal from an adverse judgment in an action commenced by plaintiff in error against defendant in error Salyne Wilson Detamore, wherein he sought recovery of certain property, and an undivided one-half interest in certain other property held in the name of said defendant, Salyne Wilson Detamore.

Plaintiff in error will hereinafter be referred to as plaintiff, and defendant in error Salyne Wilson Detamore will be referred to as defendant; other parties will be referred to as interveners or defendants as the case may be.

Plaintiff and defendant were married in November, 1924. Prior to the marriage plaintiff was operating a dairy near Tulsa. At that time he owned about 18 cows and one bull. He claims to have had $1,000 on deposit in one or more banks in Tulsa. Defendant had been working for sometime and claims to have had about $370 in the bank, and about $265 worth of household furniture. After the marriage defendant quit working for awhile, but later returned to work. She earned about $25 per week. Plaintiff continued to operate the dairy until about 1927, when plaintiff was adjudicated a bankrupt. Later he resumed the operation of the dairy.

In 1932, plaintiff and defendant together had accumulated considerable property. It consisted of $2,245 cash deposited in a bank, $6,500 in building and loan stock, $500 in stock in the Oklahoma Natural Gas Company. They had bought and paid $1,000 for 13 acres of land in Creek county upon which the dairy was operated. Title rested in defendant's name.

Prior to February, 1932, plaintiff's father died, leaving a will under which plaintiff was given an undivided one-fifth interest in lots 7 and 8, in Crosbie Heights addition to Tulsa, about $13,000 in building and loan stock, and other property. The bank account and the building and loan stock accumulated by plaintiff and defendant were carried in the name of defendant.

On March 9, 1932, plaintiff executed a bill of sale by which, for $1 and other valuable consideration, he bargained, sold, and transferred all the dairy stock, consisting of 35 head of cattle, and the dairy equipment to defendant. On

March 8, 1932, plaintiff executed a quit-claim deed whereby he conveyed the undivided one-fifth interest in lots 7 and 8, in block 6, Crosbie Heights, to defendant. On March 8, 1932, plaintiff executed an assignment in writing, whereby, for $1 and other valuable consideration, he assigned to defendant all his interest in the personal property inherited by him in the estate of his father.

The deed to the 13 acres of land in Creek county was dated February 19, 1932. However, the check given in final payment therefor was dated March 7, 1932, and "perforated" paid 3-8-32.

Domestic difficulties arose between plaintiff and defendant about the last of February, 1932. On March 7, 1932, defendant consulted an attorney and had prepared a petition for divorce. The petition was not filed until March 17, 1932. On the latter date there was filed a general appearance and waiver of summons signed by Clarence F. Mohr, purporting to have been verified before a notary public on March 7, 1932.

On March 31, 1932, the decree divorcing plaintiff and defendant was entered. Nothing was contained therein with reference to a division of property or property settlement.

This action was commenced March 24, 1937.

Plaintiff alleges that shortly before he and defendant were divorced they entered into an oral agreement that defendant was to take and hold as her own property all the household furniture, and that plaintiff was to have as his sole property the dairy herd; that plaintiff and defendant were each to have an undivided one-half interest in the 13 acres of land in Creek county upon which the dairy was operated; that each was to have a one-half interest in all the building and loan stock, which had been acquired other than that which came to plaintiff from the estate of his father; and the $500 stock or bond of the Oklahoma Natural Gas Company, and one-half of the money on deposit in the bank; and that plaintiff was to have as his sole property the one-fifth interest in the two lots in Crosbie Heights addition to Tulsa, and all the building and loan stock which had come to plaintiff from his father's estate; that at the same time it was agreed between them that plaintiff should transfer to defendant all the building and loan stock which had been acquired by them, all the building and loan stock and real estate which plaintiff had acquired from the estate of his father and all cash in the bank, amounting then to $2,245, and that defendant should hold plaintiff's interest in said money, stock, and real estate for him and for his use and benefit until such time as he should demand its return; that defendant agreed so to do and that said property was transferred to the name of defendant, to be held by her as trustee, as to his one-half interest of the property theretofore acquired by plaintiff and defendant, and as to the entire interest in that acquired from the estate of plaintiff's father; that defendant had frequently admitted and recognized said agreement, and did, under said agreement, in February, 1936, transfer and deliver to plaintiff all the building and loan stock which came from the estate of plaintiff's father; that shortly before this action was commenced he demanded transfer of all the balance of his interest in said property and that defendant refused to so transfer it. He prayed for a judgment compelling the transfer.

Defendant answered admitting that plaintiff had received from his father's estate the one-fifth interest in lots 7 and 8, in block 6, Crosbie Heights addition to Tulsa, and approximately $2,600 in building and loan stock; she admitted that plaintiff and defendant had, during their married life, accumulated the sum of $2,245, as alleged in plaintiff's petition, but alleged that said money had been expended in that $1,000 had been paid for the 13 acres of land in Creek county, $500 on a Dodge truck, and practically all the balance had been paid out for ordinary living expense and in payments on the building and loan stock, so the said fund had been entirely exhausted when the divorce decree was entered; she admitted the accumulation

of building and loan stock as alleged in plaintiff's petition, and about 25 head of dairy cows.

She then alleged in substance that before the divorce, plaintiff had become infatuated with a young girl and had become so entangled that he was threatened with prosecution, and that plaintiff had insisted that she, defendant, procure a divorce in order that he might marry the girl. That thereupon plaintiff and defendant entered into an oral agreement for division of their property; that about the time she had the petition for divorce prepared, which was on the 7th day of March, 1932, plaintiff voluntarily, of his own free will and accord, transferred to her all the right, title, and interest in all the property mentioned in the petition herein, executed the bill of sale, assignment of his interest in the personal property of his father's estate, and the quitclaim deed to the one-fifth interest in the lots in Crosbie Heights, and that the deed to the 13 acres of land had been executed to her and in her name prior thereto, on February 19, 1932, and that all of the building and loan stock and the Oklahoma Natural Gas Company stock had all been purchased in her name and that plaintiff voluntarily and of his own volition gave her all said property.

She specifically denied that there had been any agreement that she hold said property, or any part thereof, in trust for plaintiff. She then alleged that although plaintiff had voluntarily given, sold, and assigned all the building and loan stock, including that which he had received from his father's estate, she did, of her own free will and accord and without obligation so to do, transfer all that part of the building and loan stock which came from plaintiff's father's estate back to plaintiff, and caused the transfer to show on the books of the building and loan association.

Home Federal Savings & Loan Association, Security Federal Savings & Loan Association, Oklahoma Natural Gas Company, and National Bank of Commerce of Tulsa were made defendants, in order to preserve the status of the property in controversy pending the litigation.

C. B. Jordan and B. W. Cunningham intervened, claiming they had, in good faith, purchased from plaintiff 16 head of cows and one male, a part of the dairy herd.

Issues being joined by the several parties, the cause was tried to the court without a jury.

The evidence is in hopeless conflict as to what arrangement or agreement plaintiff and defendant actually had with reference to their property. Plaintiff frankly admitted all the claims of defendant which could be proved by documentary evidence. Defendant likewise frankly admitted all the claims of plaintiff which could be substantiated by documentary or other evidence. On all other matters their evidence was in direct conflict. The substance of defendant's claim is that plaintiff freely and of his own will gave her all his interest in all the property in controversy.

Plaintiff's contention is in substance that the agreement was that he was to have and keep the dairy as his own, and to equalize this, defendant was to have and keep as her own all the household furniture, which he claimed was substantially of the same value as the dairy herd and equipment. He contends that defendant took and held that part of the property which came from his father's estate in trust for him, and was to return all of it on demand; and as to the jointly acquired property, that is, the stocks, bonds, cash on deposit, and the 13 acres of land which they purchased, defendant was to have one-half as her own and was to hold the other one-half in trust for him.

The trial court made sweeping findings of fact in favor of defendant to the effect that all the property in controversy was a gift from plaintiff to defendant, and entered judgment denying any relief whatever to plaintiff, except an allowance of $850 for improvements placed upon the Creek county land by

plaintiff while he had possession thereof, and allowed plaintiff an offset against said $850 to the extent of $330, which Jordan and Cunningham had paid to plaintiff on the purchase price of the 17 head of cattle which plaintiff had sold to them, and entered judgment against defendant in favor of plaintiff for the $520, balance on said improvements, and made the same a lien on the 13 acres of land.

Plaintiff appeals, and the principal contention is that the judgment is contrary to the evidence and the law.

In his brief, plaintiff starts out with the admission that where a husband, by deed, conveyance, assignment, or otherwise, conveys property to his wife without consideration, the law presumes a gift. However, he contends that this presumption is rebuttable.

Defendant does not seriously contend that the law is not as contended by plaintiff. The rule is well stated in Bogert on Trusts & Trustees, vol. 2, p. 1394, where it is said:

"The presumption of a gift from husband to wife is one of fact only. It may be rebutted by written evidence, or by oral testimony of the statements and other conduct of the parties, as well as by proof of the circumstances of husband and wife."

Defendant asserts that since the early case of Mulhall v. Mulhall, 3 Okla. 252, 41 P. 573, the rule in this state has been that a verdict or finding on conflicting evidence and supported by competent evidence will not be disturbed on appeal, and that it is likewise well established that a finding by a court has the force and effect of a verdict.

This is the rule in law cases. But it is conceded that this is a case of equitable cognizance, and the rule is that in such cases this court will, on appeal, review and weigh the evidence, and will not disturb the findings and decree of the trial court unless it appears that such finding and decree are against the clear weight of the evidence, or, as sometimes stated, is clearly against the weight of the evidence.

The question then presented in this case is whether the findings and judgment of the trial court to the effect that the evidence is not sufficient to overcome the presumption of gift by plaintiff to defendant as to said property, or any part thereof, are against the clear weight of the evidence.

This requires examination of all the evidence as shown by the record and consideration of all the facts and circumstances as to the different parts or parcels of property involved.

We consider first all the evidence insofar as it affects the property which came to plaintiff from the estate of his father, that is, the $2,600 in building and loan stock and the one-fifth interest in the Crosbie Heights property.

It may be noted that the decree of distribution in the probate of the father's estate was entered on the 26th day of February, 1932. Up to that time no serious domestic difficulties had arisen between plaintiff and defendant.

On February 28th, according to defendant's testimony, she first discovered plaintiff's alleged infidelities.

On March 3, 1932, she first told her husband that she intended to get a divorce. Up to that time, so far as the record discloses, no threat of any kind had been made against Mohr on account of his alleged illicit relation with the young girl, Ruth McCoin. Sometime about March 8th or 9th, shortly after February 28, 1932, according to the testimony of the witness Boorstin, an attorney, the young girl, whom he named as Ruth McCoy, who was then noticeably pregnant, employed him as attorney in an effort to obtain some settlement with the party responsible for her pregnancy. From his testimony we infer that she told him that plaintiff herein was responsible for her pregnancy; thereupon he wrote or telegraphed plaintiff to come and see him; that in response thereto plaintiff came to his office, and the attorney suggested to plaintiff what he might do to him by bringing the matter to the attention of

the court in the way of a charge of responsibility of the then unborn child. In other words, a somewhat thinly veiled threat of bastardy proceedings was made.

The attorney testified that plaintiff then told him that because of a difficulty with his wife, he, plaintiff, had no property, his wife had gotten it all. For confirmation of this, plaintiff referred the attorney to Mrs. Grace Gibson, the attorney representing his wife in the contemplated divorce. Thereupon Mr. Boorstin referred the young girl to Mrs. Grace Gibson. In a few days thereafter the young girl called her attorney over the telephone and informed him that they had "patched up the matter" and for him to do nothing further. So far as the record shows, Ruth McCoy or McCoin never did consult Mrs. Grace Gibson about the matter. Plaintiff emphatically and positively denied the alleged conversations with and statements to Mr. Boorstin, and testifies positively that he never did talk with Boorstin about the matter or any other matter. But from the above it is apparent that the alleged threat of criminal prosecution or bastardy proceedings had nothing whatever to do with the transfer by plaintiff to defendant of the property which came to plaintiff from his father's estate. Plaintiff had already made the transfer before he talked to Mr. Boorstin, if he ever did talk with him, so the transfer of that particular property must have been made as a result of negotiations entirely between plaintiff and defendant. Now, whether intended as a gift, as would be presumed and as contended by defendant, or in trust, as contended by plaintiff, we must look to other facts and circumstances, since the testimony of plaintiff and defendant is in direct conflict on this matter.

The uncontradicted evidence is that defendant voluntarily returned the $2,-600 in building and loan stock. She testified, however, that she gave it back to plaintiff, not under any previous promise so to do, but to induce plaintiff not to interfere with the domestic relation then existing between defendant and her then husband, Mr. Detamore, whom she had married some 20 months after her divorce from plaintiff. Plaintiff insists that the return was made under the previous agreement.

Nina Biggert, plaintiff's sister, testified that shortly after plaintiff and defendant were divorced, defendant visited the witness in El Reno, and there told the witness that Clarence (plaintiff) had deeded his property to her (defendant), but that she intended to give it back.

William B. Mohr testified that shortly after the divorce he called upon defendant and talked with her concerning plaintiff's property which he had inherited from his father. His testimony, in part, was:

"A. Well, shortly after they had—they had the divorce, I went out to the house there where Salyne was, and asked her when she was going to return Clarence's share of the property and what he had inherited from his father. She said, well, she was holding it in trust for him. Mr. Justus: We object to that as incompetent, irrelevant and immaterial; and move the court to strike. The Court: No, I don't think so; if she made that statement that might show some—overruled. Mr. Justus: Exception. Q. (By Mr. Yancey) All right. Now, tell the court what she said about the property that Clarence had inherited from his father. A. She said she would return the property that he had inherited from his father; and that she would give him back his share of the—his rightful share of what they had accumulated together. Q. Well, what else did she say, if anything? A. She said that—told me that she had made arrangements that she had gone before some lady attorney, I don't remember the name, or who the attorney was, and that she had papers drawn that in case of her death that she would get—I mean that he would get his share of what they had accumulated, and that he would get his part of the—what he had inherited from his father, back."

He testified further that he and his brothers paid the taxes on the property, and that plaintiff paid his part, each brother contributed $125. That for a number of years he had control and

management of the property and had never paid any part of the income therefrom to defendant, and that she had never demanded that he do so.

Defendant, although recalled as witness in surrebuttal, did not deny the testimony of Mrs. Biggert and William B. Mohr.

The conduct of defendant in returning the building and loan stock and her admissions that she held the property in trust for plaintiff, together with other facts and circumstances in evidence, require a holding that as to the one-fifth interest in the Crosbie Heights property, the findings and judgment of the trial court are clearly against the weight of the evidence.

We next consider the evidence with reference to the dairy herd; that is, the 16 cows and one male, which plaintiff had sold to interveners. The record shows that plaintiff sold said cattle to interveners in May, 1933, for $1,000. They paid him $265 cash and gave their note for the balance of $735, secured by chattel mortgage on the cattle. They had paid $105 on the note at the time this action was tried. The trial court held in effect that interveners were innocent purchasers and permitted them to keep the cattle, but charged plaintiff with the $370 which he had received on the purchase price, and awarded the note and mortgage to defendant.

The uncontradicted evidence is that plaintiff was the owner of the dairy herd before he and defendant were married. These cattle were never in the name of defendant until March 9, 1932, when plaintiff executed the bill of sale transferring title to the "dairy stock and equipment consisting of 35 head of cattle * * *" to defendant. Plaintiff continued in possession of the dairy, the cattle and all equipment, and operated the dairy the same as he had before the divorce. He treated the cattle as his own, sold some cows, bought others, for more than five years after the divorce, without objection by defendant, and without any supervision by defendant, and apparently without consulting her in

any way. In other words, both parties apparently treated the dairy stock as though it belonged to plaintiff.

It may be observed that the bill of sale calls for 35 head of cattle. There is nothing to show what became of the other 18 head. Defendant makes no claim against plaintiff to account for the other 18 head of cattle, although the court allowed plaintiff $850 for improvements placed upon the land by plaintiff, charging him only with the $370 which he had received as part of the purchase price of the cows and one male which plaintiff sold to interveners.

As stated heretofore, the evidence is in direct conflict as to what the agreement was in regard to the bill of sale. Again we must look to the acts and conduct of the parties and other circumstances in determining where the weight of the evidence lies.

Aside from the testimony of plaintiff and defendant, it appears that the facts and circumstances, the conduct of the parties, the greater weight of the evidence appears to be in favor of plaintiff as to his ownership of the dairy herd, and that as to this particular property, the finding and judgment of the court is also against the clear weight of the evidence.

As to all other personal property, there is substantially no evidence tending to show that defendant recognized any ownership in plaintiff after the divorce; she treated all the building and loan stock and money on hand as her own. She alleged in her answer that substantially all the money on deposit in the bank in her name had been withdrawn and paid out before the divorce. But all the evidence is to the contrary. She drew substantially all of it out of the bank after the divorce without objection from plaintiff. Likewise she sold a part of the building and loan stock and borrowed money on part of the remainder and used all the proceeds as her own without objection from plaintiff, so that from all the facts and circumstances in evidence, the judgment of the court as to that part of the property is in accord with the weight of the evidence.

As to the 13 acres of land, it appears that plaintiff remained in possession, but paid defendant $25 per month for some reason not clear. If the dairy herd was his property, there is no apparent reason for his paying the defendant $25 per month, unless it was for use of the land. We cannot say that the judgment is against the weight of the evidence as to the land.

We hold that plaintiff is entitled to a decree for return of the one-fifth interest in the Crosbie Heights property; that he was the owner of the dairy herd and equipment and entitled to retain the money he received from interveners, and the note representing the unpaid balance and the chattel mortgage securing same. Defendant is entitled to retain all building and loan stock; and title to the 13 acres of land, charged with the cost of improvements placed thereon as found by the trial court.

The judgment is reversed and the cause is remanded, with directions to enter judgment in accord with the views herein expressed.

BAYLESS, C. J., WELCH, V. C. J., and OSBORN, HURST, DAVISON, and DANNER, JJ., concur. CORN and GIBSON, JJ., absent.